We may proceed. Thank you, Your Honor. Good morning, Your Honor. I'm Erwin Adler. I have the honor of representing WFS FINANCIAL this morning, and may it please the Court. We are here on an issue that, as far as I'm concerned, is really a very narrow pair of issues. They arise out of the handling, the interpretation of the insurance agreements entered into by my client and Progressive Insurance Company. This case arises in a somewhat unique situation because this is arisen in the context of a motion to dismiss. There's no discovery, nothing of any consequence that has taken place other than on the pleading itself. What we have is a situation in which WFS, and it's a nationwide dealer in terms of buying financial agreements for car financing. That's all it does. It was sued in Tennessee, as this Court is aware of, in the Lee case. That was a case that arose under the Equal Credit Opportunity Act. Incidentally, I apologize, Your Honor, I'd like to reserve five minutes for rebuttal. Watch your time, and I'll try to help you out as well. Thank you very much, Your Honor. Well, it was sued in Tennessee, Federal Court, Equal Credit Opportunity Act. That occurred in the first policy period that was issued by Progressive. The next year, eight months later approximately, WFS was sued a second time. It was sued in California in the Thompson case. That arose, originally it was filed under the Equal Credit Opportunity Act, and then after WFS's lawyers attempted to abate that action on the basis there was another action pending, the plaintiffs in that case completely revised that complaint to state an UNRU Act claim. There's a major difference, as this Court, I'm sure, is aware, between an UNRU Act claim and an ECOA claim. Aren't the underlying facts, though, between these two cases essentially the same? No, they're not, Your Honor. There are certain similarities. There have to be certain similarities. What we have is we have a markup rate. What we have in the first case is we have a class action brought by African Americans talking about discrimination as to them. It is a disparate economic effect. In the second action we have is the Thompson case. We have one black woman, Michelle Thompson, who is filing a case along with two Hispanics. Michelle Thompson is not a proper class representative and can't be because she was never subject to a markup rate. So what we have in the first case is a group, a class action, a group of plaintiffs suing who are African Americans. The second one we effectively have Spanish Americans, Hispanics, who are suing. Isn't it kind of the same conduct? Your Honor, it is. And I'm going to say, yes, it is kind of the same conduct. But when you are a financer of automobile loans, everything you do arises out of financing. And all has to do with markup rates in one way or another. In other words, that is the business WFS is in. And it's the same sense of I hope it's not in the business of discriminatory rates. Well, Your Honor, let me clarify that. Nobody has ever accused, including the plaintiffs in both actions, of WFS doing anything discriminatory. Both of the complaints went out of their way to describe that there was never any discrimination by WFS. WFS buys the loans in. What they do is they have, if I were to apply to WFS, WFS looks at the objective credit criteria and says, we ought to give a loan on such and such, so many points on this basis. That is the wholesale rate. But why was there a huge settlement paid? Fear. Absolutely nothing but fear, because you are going to be facing a jury. This is one of the kinds of cases that Congress has been dealing with, with class actions and extortion. If you take discrimination out of the picture, which might give you different kinds of claims in effect, and you boil it down to the wrongful act is the retail markup of the policies, correct? That is correct, Your Honor. And we don't have Is that the same act? I'm not saying it's right or wrong that you do it, but why isn't it the same act? We don't mark up the retail aspect of it. That markup is done by independent auto dealers. We do not get one dime of that money. That every dime of that money goes to the dealer. But the same markup is done regardless of who does it, whether the person is white, black, or Hispanic, or whatever, right? No, that's incorrect, Your Honor. Let me try to break this thing into two parts. We have an interest rate. Let's talk about this as an interest rate that is charged by WFS. WFS charges that to me on the basis that I am whatever my credit rating is. It then turns to the next person, has the objective criteria. It never knows whether the person is black, white, green, yellow. All it does is look at objective economic criteria. Based on that, it sets the wholesale rate. The independent auto dealers then turn around and say, hey, Irwin, you're white. We're going to give you a higher rate or a lower rate, and it's their subjective markup, which is the retail rate. That is the one that the purchaser or the person being financed pays. WFS has absolutely no control over what the independent dealer does. Isn't that your defense, not the suit? I mean, in other words, that's why you might win in the end. But doesn't it all arise out of the same structure of how this thing flows through from financing to the dealer to the actual borrower? Isn't that all sort of an integrated transaction? It starts in the same place, which is your wholesale rate, correct? It starts in the wholesale rate, yes. But in that sense, Your Honor, then that means that every activity that we do, every transaction that we conduct, every business deal that we enter into is then entirely related because that's all we do. We don't do anything else. Let's get back to what the insurance company insured. What kind of claims was it insuring? What's the language of that? It is insuring essentially errors and omissions by our people. And what the critical language in this, and that's the first issue I think is worth focusing on. The critical language that they insure is a claim made for a wrongful act that is made during the policy period. The claim that was first made in the first policy period, that is the 00 policy, is that of the Lee case in Tennessee. In the second policy period, which is the 01 policy, we have the Thompson claim. Okay, let's just break them up. What is the Lee claim? The Lee claim is the ECOA claim. And the Thompson claim, which is in the 01 policy period, that's the Unruh Act claim. That's the one that started out as an ECOA claim and that became an Unruh Act claim. Now that doesn't really, that tells me the theory on which there's recovery, not the word, which is the wrongful act. That's the insurance policy is the word wrongful act. So let's go back to Lee. Even though it's an ECOA claim, what is the wrongful act? The wrongful act is the effort or the lack of effort by WFS to control improper economic disparate impacts on African Americans. In other words, it is a class action, no question about it. In the second case, in the second situation, once the amendment process of amending, I'm sorry, once the process of amending the complaint has been completed, it then is effectively a discriminatory, intentional conduct being conducted against Hispanic Americans. Intentional discrimination against them based on the idea that we, that the auto dealers, not WFS, but the auto dealers are intentionally discriminating against them. How does your conduct, your client's conduct differ in the two cases? As between these two cases, we don't know because we never got there. There's no discovery. At least in terms of this particular case here. What we are talking about here is the effort, and that was what the argument that Progressive made in this case, is Progressive has a very tightly drafted policy. That policy talks about integrating, but it's on an integrating on a very, very narrow basis. The zero, zero policy says we can take interrelated claims so far as they are made in this policy period or arise before this policy period. Based on that particular provision, it seems very clear that temporarily, the time element that's involved here, it doesn't take, that is the zero, zero policy would not, cannot, linguistically, incorporate a claim that was made in the next policy period. It just can't happen. Well, the claim is being made in the second policy period. Right. And it can take into account things that happened in a prior policy period, right? No. No. Because in the zero, zero policy, it says we only covered, and the definition of related claims, is that which was made in this policy period or the policy period before that. In that sense, Progressive's policy is very different than every other policy of which I'm aware of in the insurance industry. Every other policy in the insurance industry talks about claims that are made in prior to this policy period, during this policy period, and after this policy period. So you can have this incorporation or this importation. Progressive didn't do that. Well, it's the same wrongful act. So let me give you a, let's say that to get one of these loans, you had to give a DNA sample. Okay. So that's the Lee case. We'll call it the Lee case. That's the OO case. You have to give a DNA sample. And then, and they say, well, that's illegal. Then Thompson comes along and says, you know what? The problem with WFS is you have to give this DNA sample. I think that's illegal. How would that be treated under this policy? Wouldn't that be the same wrongful act? Those would be two different wrongful acts. I'm making the assumption, based on what Your Honor has raised in her hypothetical, that the claim that arises out of that wrongful act is made in the two different policy periods. Am I correct on that, Your Honor? Just like it is here. Okay. That's what I'm making. Lee and Thompson. If we are in that category where we have DNA taken in two different policy periods, those claims are made in two different policy periods, based on the extant law in California. And this is a case that arises in California. Those two claims have to be treated as two different claims, and they arise under two different policy periods. That is the Homestead case. Swear on. Are you saying that they could not provide what they appear to have provided, that it's one claim and you pay it once? They could have provided had they used the proper language conceptually, possibly. But under the Homestead case, as I did in response to Judge McGowan's question a moment ago, Your Honor, the California Court of Appeal has said in the State of California, if you have two claims that are made in two policy periods, and in that case it's exactly the reverse of what we have here. The first claim was made in that case in the State court. The second case was made in the Federal court in the following year. The Court of Appeal in the Homestead case said very clearly these are two separate claims made that were made in two policy periods, and we don't even reach the question of the interrelated aspect. They specifically said we don't need to deal with that issue. Okay. So then the question becomes in the Homestead case, you have two different insurers, so I guess you have two different policies, and here we have the same insurer. And Freedman seemed to think that made a difference. Does that make a difference? It does not. Absolutely makes no difference, Your Honor, because whether you have two policies or you have two different policies by the same carrier or policies issued by separate carriers, it makes no difference because when a carrier underwrites a risk, the carrier accepts a premium for accepting a bundle of risks that consists of claims made during a particular policy year. In the case of the Homestead case, we have Homestead accepting the bundle of risks for one year under one policy, and then we have a separate carrier, American Empire, who accepts it for a different policy year. And I guess your argument would be why buy any more insurance, because everything got covered under the first policy, right? Exactly, Your Honor. That's precisely it, because when you're at the point I made at the beginning. If you are WFS, you are in the business of financing automobiles, all you do is do this. What that would mean, if Progressive is correct, we could buy ten years of policies and everything would relate back to the first policy period. We have in this case, Your Honor, let's highlight that, because I think it's worth focusing on that for one second, if I may. In this case, Progressive knew exactly what was going on. Progressive understood just like WFS that there could be subsequent claims like the Homestead case, because after all, they charged WFS for the second policy period, presumably because they got a claim in the first, 143% of the first year's premium. And if you take a look at those premiums, we're talking in the hundreds of thousands of dollars is what that costs to buy this insurance. What was WFS buying? WFS was buying coverage for certain risks, and all they are in the business of doing is financing automobiles. This is the only business that they've got. Can you give me an example of claims that are based upon or arising out of the same wrongful act or interrelated wrongful acts committed by one or more of the insured persons? In this particular case? Just any example. Oh, let's take the situation where we talk about the African Americans in the Lee case. I will accept that for purposes of this discussion and for purposes of the court's question, all of those African American borrowers who are complaining about being discriminated against in the Lee case, that constitutes an interrelated case, interrelated claims, single claim, everything fits together. In other words, I can't tell you how many thousands. I've discussed that question with the litigating lawyers who handle that. We're talking about many, many thousands of claims that were being made in that policy, and that would all be interrelated, single claim, claim made during the first policy period, the 00 policy. But those people were not the Hispanics. How about ones made in each policy period? What would be an example of interrelated claims that were made in the 00 policy period? There is no example that could take place in the context of the language progressive used here to import a claim from the second policy period into the first because the language, for two reasons. One is that under the Homestead case, we have to have the claim made in the policy period. That, in other words, the California courts have indicated we do not transfer from the second period into the first. That's the first issue. And we do that without regard to whether it's interrelated. Let's make the assumption that California will take the position as taken by some courts outside of this country, and you might wind up looking at it as being interrelated. So if we have African-Americans in a second policy period, those might be amalgamated into those cases, had progressive chosen the right language, could have been moved up into the first policy period, again, in certain states. But the bottom line of what you're saying is that that language has no effect. That language, what I'm saying is that language has and cannot legally have any effect in this case because under the. . . Any case. In this case or any case in California, if one is going to follow. . . I'm making the working assumption, which I have to in this Court, is that this Court follows Erie v. Tompkins. If this case, if the California courts have ruled on this, that is the extant law of California when they deal with the issue of what constitutes a claims-made policy, then this Court is in the same position of having to say, one doesn't import from the second period into the first without even considering the question of interrelated claims. You're down to two minutes if you want to save the. . . I will save that. Thank you very much, Your Honor. And at that point, I will sit down. Thank you. Good morning. May it please the Court, I'm Lew Loss, counsel for Progressive. Let's talk about the policy language first. Happy to do that. This policy has, these two policies both contain identical pertinent provisions providing that claims based upon or arising out of the same wrongful act or interrelated wrongful acts committed by WFS shall be considered a single claim and only one retention and limit of liability shall be applicable. However, each such single claim shall be deemed to be first made on the date the earliest of such claims was first made, regardless of whether such date is successive one-year claims made policies. Progressive's strongly held view is that WFS has received precisely the coverage for which the parties bargained. There were two claims made, one in the first policy period, one in the second policy period. I really don't see how there can be a substantial argument as to whether they are or are not related, but I'm happy to engage in that discussion, of course. The policy provides that if WFS is sued in two related claims, that the claims will be deemed made at the time of the earliest such claim. In this instance, that's the first policy. And they got the benefits of that policy. The policy benefits were paid out in their entirety to WFS in connection with these suits. I just don't understand how it could be, as WFS maintains, that this clear and unambiguous language is for some reason unenforceable. You have these parties, same parties to these two one-year contracts, reaching this agreement, which makes perfect sense, which is that Progressive is not agreeing to stack limits, in effect, for related claims. And because you have the same parties to the two contracts at issue here, the case is entirely distinguishable from Homestead, where you had the second carrier, in effect, trying to push a loss back on the first carrier. It wasn't a situation where the first carrier was on the risk at the time the second claim was made and had provided that it would, in that second policy period, treat that claim as made during its first policy period. What's the wrongful act? Counsel for WFS suggested that while the lawsuits were virtually identical before the amendment of the Thompson complaint, that after the amendment of the Thompson complaint, they were no longer sufficiently similar to satisfy the policy language. I urge the Court, if it hasn't done so already, to kindly read the complaints. I think even a cursory read of those complaints makes it very clear that that is not so. But what I'd like to, in fact, they remain very much the same. The only real difference is that the amended complaint in Thompson adds the legal, in effect, language necessary to make out an unwrought claim, that there wasn't, that the same conduct did not just have a disparate impact, but that it also gave, was also intentional discrimination. The underlying question, Counsel, was what was the wrongful conduct? The alleged wrongful conduct, and the policy works on the basis of what's alleged. Correct. The alleged wrongful conduct in both suits is that there was this national credit pricing policy, and that this policy was alleged to allow the automobile dealers to apply subjective risk factors, or subjective factors, to determine a supplemental interest rate to be added on to an objectively determined interest rate. It was the exact same national policy that was the focus of both the Thompson and the Lee complaints. The only difference was Thompson added the allegation in the amended complaint that that conduct not only had a disparate impact, but was intentionally discriminatory. Same national policy being challenged. Is the only distinction from Homestead the fact that we are dealing here with the same company? That is the largest distinction, but there are others. The others are that the language in the Homestead policy, the first of the two policies addressed by the court in Homestead, did not even seem to contemplate that claims might be moved outside the year in which they were made. It seemed to be contemplating more just an aggregating of related claims that were made within a single policy. It didn't have this language about whether such earlier claim was made before or during the policy period. Likewise, the second policy in Homestead, issued by a different insurer, did not have any of this related claim language at all. It was relying entirely on the language in the first policy. What's key here is that the proper focus is on, in the first instance, is on the second progressive policy. And this is the point that, respectfully, I think WFS misses. The claim, the Thompson claim, the second claim, is in the first instance made in the second policy period. That's when the lawsuit is filed, no doubt about it. You look at the policy in effect at that time, and it has this related claim language. And it says that this claim is going to be deemed made. These parties can agree to this. These are the same parties. They agree that the claim will be deemed made at the time of the Lee claim, which is the earlier of the two claims. So you then look... Thompson's first? No, Lee's first. The alphabetical order is the way I remember them. If Lee had money left in its policy, and then Thompson's filed in policy two, Thompson would be covered up to the extent of the remaining limits in one? Exactly right, Your Honor. And in fact, that is what happened here. Because they were settled together, and the proceeds from policy one were used up to the policy limits. That's where the payment was made. Counsel for WFS keeps focusing on this notion that linguistically there is no language in policy year one that would allow the later made Thompson claim to be treated under policy year one. That is simply not true. Policy year two says that that claim, the Thompson claim, is going to be deemed made in year one. These are the same parties. They're agreeing it's going to be deemed made in year one. Isn't the language the same in both policies? Yes, ma'am. So Thompson is deemed made in policy year one. Well, policy one covers claims made during that policy period. The parties have agreed to this fiction that it's going to be deemed made in year one. And the matter proceeds forward on that basis. I'd like to address one other point that counsel for WFS made. He suggested a couple of times that if progressives' construction of its policy, which the district court accepted here, were to be accepted by this court, that in effect there's no coverage potentially available under the second policy, because these suits arise out of the core of WFS's automobile financing business. That is simply not so. You could have a fraud claim. You could have a director defaulting. You could have another employment claim. All manner of claims, you know, investors, vendors, customers. And it would be ultimately the point that counsel makes, it seems to me, would be judged by are the two suits sufficiently related. I mean, if progressives were to try to apply the related claim language to something that really has no connection to this national credit pricing policy, but maybe somehow some very tangential connection is identified, well, I would think progressives wouldn't do that in the first instance, but certainly a court would reject that as too remote and not a proper application. So to the extent there's an illusory coverage argument floating around here, it is simply without basis. Have counsel tried to make a point of the increase in premium? What's your response to that? The premiums are what they were, but I don't have the foggiest idea how those calculations were done, Your Honor. It's not in the record. I would submit that this court is, this case is really governed primarily by the Bay Cities case, in which the California Supreme Court adopted a broad reading of related claims type language. Bay Cities makes it very clear, as many other cases cited by the California Supreme Court, that insurance policies are to be applied according to their plain and unambiguous terms. That is what the district court did here to undisputed facts regarding the interrelationship between these two lawsuits that were ultimately settled together, and we respectfully request that this court affirm the district court's ruling. Thank you. You have just under two minutes. Your Honor, I will try to meet that timeline. A number of comments that Mr. Laws made, I think he inadvertently misspoke himself in terms of the lack of language in the Homestead case dealing with interrelated claims and the claims first made. In our reply brief, footnote 7 on page 7, fortuitously, we outline that essentially we have the identical claims-made language, or virtually identical claims-made language, between the progressive policies and the policies that were considered in the Homestead case. Furthermore, the interrelated claims argument, the interrelated claims clause, that is also set forth in the same footnote, and as the court will undoubtedly note, that in that situation, that particular clause dealt with claims made before, during, and after the policy period, and the California Court of Appeals said we don't care whether it's before, during, or after. Claims made means what it says, claims made during the policy period. To Your Honor's question, this is to Judge Fletcher, in terms of the premium issue, the 144 percent increase in the second policy period, everybody understood that a claim had been made in the second policy period. Attached to the complaint are letters indicating that progressive understood that both of these claims would individually exhaust, respectively, the 0 and 01 policies. There is no evidence dealing with the premium cost or the increase in premium, because after all, this was a motion to dismiss. We never got to discovery on this issue. Third issue that I'd like to focus on for a second, which is in some degree related to what I started off with, is the Wendt case deals with a clause just like we saw in the Homestead case, and that is, in other words, dealing with before, during, and after. In this case, all we deal with is under the 00 policy is before and during. The 00 policy, yes, language can be malleable, but before and during does not mean after. And so, therefore, the Thompson case, the second case, cannot be imported into the first policy period. Finally, in terms of what happened in the Superior Court, Mr. Laws makes great light of the fact that the language in the case, in the second case, that is the Thompson case, is fairly similar in the complaints. So what? Even if there is some similarity, that issue was raised before the Superior Court of the State of California. WFS sought to dismiss it. WFS later sought to go ahead and suppress discovery on the basis that the two claims were related. In both cases, the Superior Court concluded that the two claims were sufficiently unrelated, that the Thompson case should go forth despite the Lee case, and furthermore, the court refused to abate discovery and issue a protective order in the Thompson case, because the claims were sufficiently unrelated to allow that second case to go forward. So, in other words, the Superior Court, and typically carriers are bound by what happens in the underlying cases. In this case, the Superior Court has already concluded that those two were unrelated. Based on that, there is nothing further that I have to add, unless the Court has any questions. It appears not. Thank you. Thank you both for your arguments this morning. The case of WFS Financial v. Progressive is submitted.
judges: B. Fletcher, McKeown, Whyte